AUSA: Angela Zhu

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 25 MAG 3441

UNITED STATES OF AMERICA

v.

KELLI DIANN AUSTIN,

Defendant.

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 1343, 1349

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

TODD KANESHIRO, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

1.      From at least in or about June 2020 up to and including at least in or about July 2021, in the Southern District of New York and elsewhere, KELLI DIANN AUSTIN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2.      It was a part and an object of the conspiracy that KELLI DIANN AUSTIN, the defendant, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which did affect a financial institution, in violation of Title 18, United States Code, Section 1343, to wit, AUSTIN and others agreed to engage in a scheme to obtain loans from various financial institutions guaranteed by the U.S. Small Business Administration ("SBA"), through the SBA's Paycheck Protection Program ("PPP"), by submitting fraudulent applications for PPP loans and using the loan proceeds for unauthorized purposes, and they engaged in and caused others to engage in telephone calls, the review and approval of loan applications, and wire transfers in the Southern District of New York, and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

3.      From at least in or about June 2020 up to and including at least in or about July 2021, in the Southern District of New York and elsewhere, KELLI DIANN AUSTIN, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and

for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, AUSTIN obtained loans from various financial institutions guaranteed by the SBA, through the SBA's PPP, by submitting fraudulent applications for PPP loans, and engaged in and caused others to engage in telephone calls, the review and approval of loan applications, and wire transfers in the Southern District of New York, and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1343.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

4.      I am a Special Agent with the FBI and have been since in or about 2016.  During my time with the FBI, I have worked on numerous investigations of wire fraud and other white-collar crimes.  This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement officers, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during my participation in the investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview of the Fraudulent Conduct

5.      As set forth below, from at least in or about June 2020 up to and including at least in or about July 2021, KELLI DIANN AUSTIN, the defendant, engaged in a scheme with a co-conspirator ("CC-1"), and others known and unknown, to fraudulently obtain PPP funds from various financial institutions.  AUSTIN submitted to the SBA at least four PPP loan applications, each of which contained materially false and fraudulent representations (the "Fraudulent PPP Applications"), including that the loans would be used for payroll and other business expenses. The Fraudulent PPP Applications sought PPP loans for three different entities.  In total, after submitting the Fraudulent PPP Applications, AUSTIN obtained approximately $1.7 million in PPP loans, which she then used for personal and unauthorized purposes, including by purchasing luxury vehicles and a house for a family member as well as by making large payments to individuals who are not AUSTIN's employees.

### The Paycheck Protection Program

6.      Based on my training and experience and my review of publicly available information, I know the following, in substance and in part:

a.      The PPP was enacted into federal law as part of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") in March 2020.  Among other things, the CARES Act authorized billions of dollars in forgivable loans to small businesses for job retention and certain other business expenses through the PPP.  On or about December 27, 2020, the Consolidated Appropriations Act of 2021, which included the Economic Aid to Hard-Hit Small Businesses, Nonprofit, and Venues Act (the "Relief Act") was signed into law, which allowed

certain businesses that had already obtained a PPP loan to obtain an additional "second draw" PPP loan. The Relief Act also re-opened the application period for "first draw" PPP loans to businesses that had not been approved for "first draw" PPP loans prior to August 8, 2020, or who may have been eligible to receive more funds during the "first draw" period than they actually received.

      b.     Businesses that obtained PPP loans were required to use those loans for their payroll costs, mortgage interest, rent, and/or utilities, among other specified expenses. Pursuant to the CARES Act, the amount of PPP funds a business was eligible to receive was determined by the number of employees and average payroll costs. The PPP is overseen by the SBA, which has authority over all PPP loans, but individual PPP loans were issued by approved commercial lenders, who would receive and process PPP applications and supporting documentation.

      c.     Borrowers through the PPP were also eligible to apply for loan forgiveness once they had used all loan proceeds for which forgiveness was requested.

### June 25, 2020 Loan Application

7.     Based on my participation in this investigation, including my review of records provided by a bank ("Bank-1"), I have learned the following, in substance and in part:

      a.     On or about June 25, 2020, KELLI DIANN AUSTIN, the defendant, applied for an approximately $458,600 PPP loan on behalf of "UNCOMMONCENTS.COM, INC." (the "June 25, 2020 Loan Application").

      b.     In the June 25, 2020 Loan Application, AUSTIN provided the following information, in substance and in part: (i) Uncommoncents.com, Inc., was established on or about October 7, 2015, had a primary business address at a residential home in Texas (the "Austin Residence"), had 15 employees, and had average monthly payroll expenses of approximately $183,440; (ii) AUSTIN was the President and sole owner of Uncommoncents.com, Inc.; and (iii) the stated purpose of the PPP loan was for payroll, rent/mortgage interest, and utilities for Uncommoncents.com, Inc.

      c.     In the June 25, 2020 Loan Application, AUSTIN further certified that the loan for which she was applying would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule" and that she understood "that if the funds are knowingly used for unauthorized purposes, the federal government may hold [her] legally liable, such as for charges of fraud."

      d.     In the June 25, 2020 Loan Application, AUSTIN further certified "that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects," and that she understood "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law," including certain provisions of federal law.

      e.     In connection with the June 25, 2020 Loan Application, AUSTIN provided a front and back image of a Texas State Identification Card, which listed an address at the Austin Residence, and which depicts what appears to be AUSTIN's handwritten signature underneath a

photo of an individual who, based on my review of law enforcement photographs and my interactions in person with AUSTIN, I believe to be AUSTIN (the "AUSTIN ID Card").

8.    Based on my conversations with law enforcement officers and with representatives of the Texas Workforce Commission,[1] I have learned that Texas employers are required to file quarterly wage reports for their employees.  Records provided by the Texas Workforce Commission showed no record of employee wages for Uncommoncents.com, Inc.

9.    Based on my review of records provided by Bank-1 in connection with the June 25, 2020 Loan Application, I have learned the following, in substance and in part:

    a.    On or about July 1, 2020, KELLI DIANN AUSTIN, the defendant, entered into an agreement with Bank-1 for an approximately $458,600 loan issued by Bank-1, representing the PPP loan granted as a result of the June 25, 2020 Loan Application.  The loan agreement includes a signature for AUSTIN, which is consistent in appearance with the signature on the AUSTIN ID Card.

    b.    On or about July 1, 2020, AUSTIN signed an "Electronic Funds Transfer Authorization Form" in order to receive the loan.  The handwritten signature on this form is consistent in appearance with the signature on the AUSTIN ID Card.  AUSTIN provided to Bank-1 a savings account number ending in -1259 (the "1259 AUSTIN Account") at another bank ("Bank-2") for the loan transfer.  On or about July 2, 2020, an attempted transfer for the PPP loan to the 1259 AUSTIN Account was rejected due to a "name mismatch."

    c.    On or about July 5, 2020, AUSTIN signed another "Electronic Funds Transfer Authorization Form."  The handwritten signature on this form is consistent in appearance with the signature on the AUSTIN ID Card.  AUSTIN provided a checking account number ending in 6221 (the "6221 Account") at another bank ("Bank-3") for the PPP loan transfer.

10.    Based on my review of documents from Bank-1 and my conversation with an employee at Bank-1 ("Bank-1 Employee"), I learned, in substance and in part, that Bank-1 is headquartered in Manhattan, New York, and that the Bank-1 Employee was personally involved in communications about the loan described *supra* ¶ 9 while working in the Southern District of New York.

11.    Based on my review of records from Bank-3, I have learned the following about the 6221 Account, in substance and in part:

    a.    The 6221 Account was opened on or about July 6, 2020, with an initial deposit of approximately $500.  The 6221 Account was opened under the name of an individual ("Individual-1"), who has the same last name as KELLI DIANN AUSTIN, the defendant, and the opening documents listed the account holder as "d/b/a Uncommoncents.com" with an address of the Austin Residence.  Individual-1 is listed in opening documents for the 6221 Account as the "Sole Proprietor" of Uncommoncents.com.

---

[1] The Texas Workforce Commission is a government agency that provides unemployment benefits and other employment-related services, and which requires employers to report wages and pay taxes in connection with those benefits.

b.      On or about July 7, 2020, the 6221 Account received a wire transfer in the amount of approximately $458,600 from Bank-1, *i.e.*, the loan for which AUSTIN applied in the June 25, 2020 Loan Application.

c.      On or about July 8, 2020, four cashier's checks were issued from the 6221 Account for an aggregate amount of approximately $388,000, as follows: (i) approximately $110,000 to an individual ("Individual-2"); (ii) approximately $110,000 to the estate of an individual with the same last name as Individual-2; (iii) approximately $75,000 to an investment company; and (iv) approximately $93,000 to "Sunray Holdings," described further herein. None of these payments appear to be for purposes authorized under the PPP.

d.      On or about July 22, 2020, a check in the amount of approximately $9,182 was written from the 6221 Account to Sunray Holdings.

e.      Continuing through in or about October 2020, additional withdrawals and purchases were made from the 6221 Account, none of which appear to be consistent with any approved PPP expense. As of on or about November 30, 2020, the 6221 Account had a negative balance.

f.      The only deposits into the 6221 Account, aside from interest accrued and ATM surcharge rebates, were the approximately $500 initial account opening deposit and the approximately $458,600 PPP loan.

## January 14, 2021 Loan Application

12.     Based on my review of records provided by Bank-1, I have learned the following, in substance and in part:

a.      On or about January 14, 2021, KELLI DIANN AUSTIN, the defendant, applied for an approximately $206,250 PPP loan as "Kelli Austin D/B/A Camelot Nevada Trust" (the "January 14, 2021 Loan Application").

b.      In the January 14, 2021 Loan Application, AUSTIN provided the following information, in substance and in part: (i) Camelot Nevada Trust was established on or about June 12, 2018, had a primary business address at the Austin Residence, had 14 employees, and had average monthly payroll expenses of approximately $82,500; (ii) AUSTIN was the beneficial owner and control person of Camelot Nevada Trust with a 95% ownership interest; and (iii) the stated purpose of the PPP loan was for payroll, rent/mortgage interest, utilities, covered operations expenses, covered supplier costs, and covered worker protection expenditures.

c.      In the January 14, 2021 Loan Application, AUSTIN answered in the negative that "the Applicant or any owner of the Applicant" was "an owner of any other business, or [had] common management with any other business."

d.      In support of the January 14, 2021 Loan Application, AUSTIN provided account statements for January 2021, February 2021, and March 2021, for an account ending in -1103 at Bank-2 (the "1103 Account"), which was purportedly held in the name of Camelot Nevada Trust.

e.    In the January 14, 2021 Loan Application, the contact information listed was an individual ("Individual-3"), who was purportedly the accountant for "Camelot Financial." AUSTIN signed the January 14, 2021 Loan Application as the borrower for the loan.

f.    In the January 14, 2021 Loan Application, AUSTIN made substantially the same certifications as to the use of PPP loan funds and the legal penalties as described *supra* ¶¶ 7(c)–(d).

13.    Based on records provided by the Texas Workforce Commission, there is no record of employee wages for Camelot Nevada Trust.

14.    Based on my review of records provided by Bank-2, I have learned that the account holder of the 1103 Account is not Camelot Nevada Trust, as reflected by the documents submitted by KELLI DIANN AUSTIN, the defendant, in support of the January 14, 2021 Loan Application, but rather, a different entity whose sole proprietor is listed as Individual-1. That is, the loan documents submitted by AUSTIN appear to have been fraudulently altered.

15.    Based on a review of records from Bank-2, records provided by the Texas Workforce Commission, and publicly available information, I have learned the following, in substance and in part, about an account ending in -5113 (the "5113 AUSTIN Camelot Account"):

a.    The 5113 AUSTIN Camelot Account was opened on or about May 3, 2021, under a "DBA" name of "Camelot Nevada Tr," with KELLI DIANN AUSTIN, the defendant, listed as its sole proprietor. On or about May 3, 2021, an opening deposit was made in the amount of approximately $25.

b.    On or about June 30, 2021, the 5113 AUSTIN Camelot Account received a wire transfer from Bank-1 in the amount of approximately $206,250, representing the PPP loan granted as a result of the January 14, 2021 Loan Application. At that time, no other transaction activity had occurred in the 5113 AUSTIN Camelot Account.

c.    On or about the same day, June 30, 2021, an online bank transfer in the amount of approximately $75,000 was initiated from the 5113 AUSTIN Camelot Account to a checking account ending in 6444 (the "6444 AUSTIN Account"). Based on my review of records provided by Bank-2 for the 6444 AUSTIN Account, I have learned that the 6444 AUSTIN Account is held in the name of AUSTIN with an address at the Austin Residence.

d.    Also on or about June 30, 2021, a wire payment in the amount of approximately $59,354.32 was made from the 5113 AUSTIN Camelot Account to an account at Bank-2 ending in -3055 (the "Attorney Account"), held by an attorney in Manhattan, New York (the "Attorney").

e.    By on or about August 31, 2021, the balance in the 5113 AUSTIN Camelot Account was approximately $1.56. Between on or about July 1, 2021, and on or about August 31, 2021, the following total transfers were made from the 5113 AUSTIN Camelot Account, in addition to those described above:

6

i.      Approximately $14,550 was transferred to accounts held under the name of CC-1.  There is no record of CC-1 receiving wages from Camelot Nevada Trust or from Uncommoncents.com.

ii.     Approximately $32,969.12 was transferred to the 6444 AUSTIN Account.

iii.    Approximately $1,850 was transferred to an account ending in -5100 (the "5100 AUSTIN Camelot Account").

iv.     Approximately $8,650 was transferred to bank accounts held under "Austin."

v.      Approximately $6,500 was transferred to bank accounts held under the name of a family member of AUSTIN ("Individual-4"), discussed *infra* ¶¶ 25–26.

vi.     Approximately $4,000 was transferred to an account held under the name of an individual whose last name is the same as CC-1's maiden name ("Individual-5").  There is no record of Individual-5 receiving wages from Camelot Nevada Trust or from Uncommoncents.com.

### February 19, 2021 Loan Application

16.     Based on my review of records provided by Bank-1, I have learned the following, in substance and in part:

a.      On or about February 19, 2021, KELLI DIANN AUSTIN, the defendant, applied for an approximately $642,040 PPP loan on behalf of "UNCOMMONCENTS.COM, INC." (the "February 19, 2021 Loan Application").

b.      In the February 19, 2021 Loan Application, AUSTIN, the listed borrower on the application, provided the following information, in substance and in part: (i) Uncommoncents.com, Inc. was established in or about 2016, had a primary business address at the Austin Residence, had 20 employees, and had average monthly payroll expenses of approximately $183,440; (ii) AUSTIN was the sole owner; and (iii) the stated purpose of the PPP loan was for payroll, rent/mortgage interest, utilities, covered operations expenditures, covered property damage, covered supplier costs, and covered worker protection expenditures.

c.      In the February 19, 2021 Loan Application, AUSTIN answered in the negative that "the Applicant or any owner of the Applicant" was "an owner of any other business, or [had] common management with any other business."

d.      In support of the February 19, 2021 Loan Application, AUSTIN provided account statements for December 2020, January 2021, and February 2021, purportedly for an account ending in -5481 at Bank-2 (the "5481 Uncommoncents Account"), which was purportedly held in the name of Uncommoncents.com.

     e.     In the February 19, 2021 Loan Application, AUSTIN further certified that the funds for which she was applying would be used for certain specified expenses under the PPP rules and that she understood "that if the funds are knowingly used for unauthorized purposes, the federal government may hold [her] legally liable, such as for charges of fraud." AUSTIN also made substantially the same certifications as to the legal penalties as described *supra* ¶¶ 7(c)–(d).

     17.     Based on my review of records provided by Bank-1 in connection with the February 19, 2021 Loan Application, I have learned that, on or about March 18, 2021, KELLI DIANN AUSTIN, the defendant, entered into an agreement with Bank-1 for a $642,040 loan, issued by Bank-1. The digital image of a handwritten signature on the loan agreement is consistent in appearance with the signature on the AUSTIN ID Card.

     18.     Based on my review of records from Bank-2, I have learned the following, in substance and in part:

     a.     On or about March 17, 2021, the 5481 Uncommoncents Account was opened under the name Uncommoncents.com, Inc., with an authorized signor ("Individual-6"). Its beginning balance was zero.

     b.     The 5481 Uncommoncents Account had no December 2020, January 2021, or February 2021 statements, and therefore, the supporting documents KELLI DIANN AUSTIN, the defendant, submitted in support of the February 19, 2021 Loan Application were fabricated. Bank-2 records in fact show that the statements submitted by AUSTIN in connection with the February 19, 2021 Loan Application were from a different bank account held by an unrelated party at Bank-2, with a different account name and number, and had been modified to appear as though the statements were associated with the 5481 Uncommoncents Account.

     c.     On or about March 22, 2021, the 5481 Uncommoncents Account received a wire from Bank-1 in the amount of approximately $642,040, representing the PPP loan funds resulting from the February 19, 2021 Loan Application.

     d.     On or about March 23, 2021, a transfer in the amount of approximately $450,000 was made from the 5481 Uncommoncents Account to an account ending in -1259, which is the same 1259 AUSTIN Account to which AUSTIN had initially attempted (but failed) to receive loan funds relating to the earlier June 25, 2020 Loan Application. *See supra* ¶ 9(b).

     e.     Between on or about March 23, 2021, and on or about April 30, 2021, the 5481 Uncommoncents Account transferred an additional approximately $149,520 over approximately 23 separate transactions into the 1259 AUSTIN Account.

     19.     Based on my review of records from Bank-2, I have learned the following, in substance and in part, about the 1259 AUSTIN Account, which received the above-described funds:

     a.     The 1259 AUSTIN Account was opened on or about May 25, 2018, in the name of KELLI DIANN AUSTIN, the defendant. On or about March 22, 2021, the account balance was approximately $2,742.62.

b.      Between on or about March 23, 2021, and on or about April 30, 2021, the 1259 AUSTIN Account received the above-described transfers from the 5481 Uncommoncents Account.

c.      On or about March 23, 2021, approximately $50,000 was transferred to Mercedes Benz from the 1259 AUSTIN Account, and two checks were written from the 1259 AUSTIN Account to Mercedes Benz, in the amounts of approximately $78,520.31, and approximately $99,691.15. On or about the same day, approximately $185,000 was transferred from the 1259 AUSTIN Account to CC-1.

d.      On or about March 25, 2021, approximately $16,000 was wired from the 1259 AUSTIN Account, with the beneficiary listed as AUSTIN's father.

e.      Continuing through in or about April 5, 2021, additional transfers were made from the 1259 AUSTIN Account that appeared to be inconsistent with any approved PPP loan purpose.

20.     Based on my review of records provided by Mercedes Benz, I have learned the following, in substance and in part:

a.      On or about March 20, 2021, an individual with the same last name as KELLI DIANN AUSTIN, the defendant, ("Individual-7") who reportedly resides at the Austin Residence, purchased a 2021 Mercedes Benz E350W for approximately $78,520.31. The vehicle was paid for by a cashier's check dated March 23, 2021, with AUSTIN listed as the remitter.

b.      On or about March 20, 2021, Uncommoncents.com purchased a 2021 Mercedes Benz GLS450W4 for approximately $99,691.15. The purchase agreement was signed by AUSTIN. The vehicle was paid for by a cashier's check dated March 23, 2021, with AUSTIN listed as the remitter.

c.      On or about March 23, 2021, CC-1 purchased a 2021 Mercedes Benz GLS450W1 for approximately $101,673.10. The purchase agreement was signed by CC-1. CC-1 reportedly resides at an address on the same street as the Austin Residence. The vehicle was paid for by a combination of the following payments:

i.      An approximately $50,000 debit charge made under AUSTIN's name, which was verified by PIN;

ii.     One debit charge and two checks made payable by CC-1, totaling approximately $51,673.10.

### March 24, 2021 Loan Application

21.     Based on my review of records provided by Bank-1, I have learned the following, in substance and in part:

a.      On or about March 24, 2021, KELLI DIANN AUSTIN, the defendant, applied for an approximately $387,257.32 PPP loan on behalf of an entity purporting to be a

partnership under the business name "CAMELOT NEVADA TRUST" (the "March 24, 2021 Loan Application").

b.    In the March 24, 2021 Loan Application, AUSTIN provided the following information, in substance and in part: (i) Camelot Nevada Trust was established in or about 2011, had a primary business address at the Austin Residence, had 20 employees, and had average monthly payroll expenses of approximately $154,902.93; (ii) AUSTIN was the sole beneficial owner; and (iii) the stated purpose of the PPP loan was for payroll, rent/mortgage interest, utilities, covered operations expenditures, covered property damage, covered supplier costs, and covered worker protection expenditures.

c.    In the March 24, 2021 Loan Application, AUSTIN answered in the negative that "the Applicant or any owner of the Applicant" was "an owner of any other business, or [had] common management with any other business."

d.    In support of the March 24, 2021 Loan Application, AUSTIN provided account statements for January 2021, February 2021, and March 2021, for an account ending in -0961 at a bank ("Bank-4") (the "0961 Account"), which was purportedly held in the name of Camelot Nevada Trust with an address at the Austin Residence. The February 2021 statement, as an example, purportedly reflected approximately $71,442 in payroll expenses, with a balance of approximately $51,170.

e.    In the March 24, 2021 Loan Application, AUSTIN made substantially the same certifications as to the use of PPP loan funds and the legal penalties as described *supra* ¶ 16(e).

f.    The March 24, 2021 Loan Application bears a digital image of a handwritten signature that is consistent in appearance with the signature on the AUSTIN ID Card.

22.    Based on my review of records provided by Bank-4, I have learned the following about the 0961 Account, in substance and in part:

a.    The account holder of the 0961 Account is Individual-3, "DBA Camelot Nevada Trust." The February 2021 statement reflected only an approximately $10 maintenance fee and no payroll expenditures, and reflected an account balance of approximately $170. That is, the loan documents submitted by KELLI DIANN AUSTIN, the defendant, in connection with the March 24, 2021 Loan Application appear to have been fraudulently altered to reflect payroll expenses and a higher account balance.

23.    Based on my conversations with employees of Bank-1 and my review of toll records provided by a phone service provider, I have learned that, from in or about May 2021 to June 2021, a phone number used by KELLI DIANN AUSTIN, the defendant (the "Austin Phone Number" [2]) called the Manhattan headquarters of Bank-1, Bank-1 Employee's office number, and Bank-1 Employee's cellphone number, respectively.

---

[2] Phone service provider records indicate that the billing party for the Austin Phone Number is CC-1; however, the "user information" in those records lists AUSTIN as the user of the Austin Phone Number.

24.     Based on my review of records provided by Bank-1 in connection with the March 24, 2021 Loan Application, I have learned that on or about June 30, 2021, Bank-1 issued a wire transfer in the amount of approximately $387,257.32 to "Camelot Nevada Trust DBA Camelot Financial" using the 5100 AUSTIN Camelot Account, which is the same account that received funds from the 5113 AUSTIN Camelot Account from proceeds of the loan resulting from the January 14, 2021 Loan Application.  *See supra* ¶ 15(e)(iii).

25.     Based on my review of records provided by Bank-2, I have learned the following about the 5100 AUSTIN Camelot Account, in substance and in part:

a.     The 5100 AUSTIN Camelot Account was opened on or about April 29, 2021.  It is held in the name of KELLI DIANN AUSTIN, the defendant, as the sole proprietor "DBA Camelot Nevada Tr."  On or about June 28, 2021, the account balance was approximately $10.

b.     On or about June 30, 2021, the above-described wire in the amount of approximately $387,257.32 was received into the 5100 AUSTIN Camelot Account from the lending bank, Bank-1, reflecting PPP loan funds resulting from the March 24, 2021 Loan Application.

c.     On or about July 1, 2021, an approximately $370,000 wire transfer was sent from the 5100 AUSTIN Camelot Account to an account held under the name of Individual-4, who had previously received funds from AUSTIN as described above.  *See supra* ¶ 15(e)(v).  On or about July 2, 2021, another approximately $10,500 wire transfer was sent from the 5100 AUSTIN Camelot Account to Individual-4.

26.     Based on my conversation with Individual-4 on or about June 17, 2022, I have learned, in substance and in part, that Individual-4 is a family member of KELLI DIANN AUSTIN, the defendant, and that Individual-4 received approximately $405,000 from AUSTIN, which Individual-4 understood to be a gift to buy Individual-4's home.  Part of these funds were received as an approximately $370,000 wire transfer to Individual-4 with the memo "Payroll Disbursement."  Individual-4 did not understand the memo, as the funds were not for any payroll disbursement.  AUSTIN told Individual-4, in substance and in part, that the proceeds came from stock sales.

### The 5639 CC-1 Sunray Holdings Account

27.     Based on my review of records provided by a bank ("Bank-5"), I have learned the following about an account ending in -5639 (the "5639 CC-1 Sunray Holdings Account"), in substance and in part:

a.     The 5639 CC-1 Sunray Holdings Account was opened on or about January 6, 2017.  The owner of the 5639 CC-1 Sunray Holdings Account is CC-1.  The 5639 CC-1 Sunray Holdings Account has a "DBA" name of "Sunray Holdings or Uncommoncents.com."  The account address is the CC-1 Residence.

b.     On or about July 8, 2020, the 5639 CC-1 Sunray Holdings Account received a check in the amount of approximately $93,000 corresponding to the check described *supra* ¶ 11(c), which came from loan proceeds in connection with the June 25, 2020 Loan Application.

11

Also on or about July 8, 2020, the 5639 CC-1 Sunray Holdings Account issued a check to Volkswagen in the amount of approximately $53,478.27. The memo on the check was for an "Atlas Cross Sport," which is a model of Volkswagen vehicle.

        c.    On or about July 22, 2020, the 5639 CC-1 Sunray Holdings Account received a check in the amount of approximately $9,182, which, as described *supra* ¶ 11(d) came from loan proceeds in connection with the June 25, 2020 Loan Application. Also on or about July 22, 2020, the 5639 CC-1 Sunray Holdings Account issued a check to "Cash" in the amount of approximately $9,500. The check was signed by CC-1.

        d.    On or about August 10, 2020, the 5639 CC-1 Sunray Holdings Account received a wire transfer with description "SBA Loan" in the amount of approximately $20,833.

28.    Based on records provided by a bank ("Bank-6"), the approximately $20,833 wire transfer dated on or about August 10, 2020, reflects loan funds from a PPP loan for which CC-1 applied.

29.    Based on my interview of CC-1, on or about April 18, 2022, CC-1 stated, in substance and in part, that CC-1 had never applied for a PPP loan, in contradiction to the Bank-6 records described above. At this interview, I observed that CC-1 drove a Mercedes Benz SUV. During the course of this interview, KELLI DIANN AUSTIN, the defendant, also arrived at the place of the interview of CC-1, also driving a Mercedes Benz SUV.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of KELLI DIANN AUSTIN, the defendant, and that she be arrested, and imprisoned or bailed, as the case may be.

*s/ Todd Kaneshiro by the Court with permission*

        _____

        TODD KANESHIRO
        Special Agent
        Federal Bureau of Investigation

Sworn to me through the transmission of
this Complaint by reliable electronic
means (telephone), this 29th day of
October.

_____
THE HONORABLE BARBARA MOSES
United States Magistrate Judge
Southern District of New York